UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MICHAEL CARSLEY,

    *Plaintiff*,

v.

DEFENSE OFFICE OF HEARINGS AND APPEALS,

    *Defendant.*

No. 21-cv-37 (DLF)

**MEMORANDUM OPINION**

In the proceedings below, the Defense Office of Hearings and Appeals waived some but not all of Michael Carsley's debts to the United States. In this action, Carsley argues that the Office's decision not to waive his remaining debts was arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). Before the Court are Carsley's Motion for Summary Judgment, Dkt. 12, and the government's Motion for Summary Judgment, Dkt. 13. For the reasons that follow, this Court will grant the government's motion and deny Carsley's.

**I.    BACKGROUND**

    **A.    Legal Background**

Federal law permits agency officials to waive certain government debts upon finding that their collection "would be against equity and good conscience and not in the best interests of the United States." 5 U.S.C. § 5584(a). Congress has specifically prohibited waiver when an agency official finds "an indication of fraud, misrepresentation, fault, or lack of good faith on the part of the employee or any other person having an interest in obtaining a waiver of the claim." *Id.* § 5584(b)(1). The Department of Defense has also promulgated regulations to govern the

debts within its purview. *See* 32 C.F.R. pt. 284, app. B. Under those regulations, "[t]he fact that an erroneous payment is solely the result of administrative error or mistake on the part of the Government is not sufficient basis in and of itself for granting a waiver." *Id.* § 3. The regulations also advise that a waiver "usually is not appropriate when a recipient knows, or reasonably should know, that a payment is erroneous." *Id.* § 4. Instead, when a recipient learns of an error, he "has a duty to notify an appropriate official and to set aside the funds for eventual repayment to the Government, even if the Government fails to act after such notification." *Id.* Finally, the Department's regulations provide that "[f]inancial hardship is not a factor for consideration in determining whether a waiver is appropriate." *Id.* § 7.

    **B.**    **Factual Background**

Michael Carsley retired from active duty in the United States Navy in 2013. *See* A.R. 214. In August of that year, he accepted a civilian position with a Navy support facility in Rota, Spain. *See* A.R. 117–19, 227. Carsley was already in the country at that time, staying at his house in Cadiz, Spain on a family vacation that ran from July 2013 through October 2013. *See* A.R. 158, 216, 227–28. Carsley informed the Rota Human Resources Office that he was in Spain in the same email through which he accepted the position. A.R. 227.

On October 24, 2013, Carsley completed a questionnaire regarding his eligibility for a living quarters allowance (LQA). *See* A.R. 217–21. The Department of Defense grants that benefit to select employees that serve outside the United States "to reimburse [them] for substantially all costs . . . [of their] residence quarters." Dep't of State Standardized Regs. ("DSSR") § 112 (Sept. 10, 2000). Under regulations issued by the Department of State, which the Department of Defense has adopted, *see* Dep't of Def. Instruction (DoDI) 1400.25, vol. 1250 (Feb. 23, 2012), "[q]uarters allowances . . . may be granted to employees who were recruited by

2

the employing government agency in the United States." DSSR § 031.11 (Apr. 3, 2016). LQA may also be granted to certain employees who were "recruited outside the United States." *Id.* § 031.12. To qualify, an employee recruited outside the United States may show that his actual residence is "fairly attributable to his[] employment by the United States Government;" that he was previously recruited in the United States by one of several enumerated entities; and that he "had been in substantially continuous employment by such employer under conditions which provided for his/her return transportation to the United States*.*" *Id.* § 031.12(a)–(b).

Several answers on his LQA questionnaire indicated that Carsley was "recruited . . . in the United States." *Id.* § 031.11. First, Carsley stated that he applied for his new position "while physically residing in the United States." A.R. 217. Second, he stated that he "receive[d] the job offer while physically residing in the United States or a US territory, possession or protectorate." *Id.* Finally, he listed a Philadelphia, Pennsylvania address as the location where he had "physically lived" from July 10, 2013 to the present. A.R. 218. Based on those answers, the Navy granted Carsley LQA. *See* A.R. 139 (noting that the Rota facility "has no records other than the questionnaire to determine why [he] was deemed eligible" for that benefit).

On August 16, 2016, Carsley received a memorandum from the Human Resources Office of U.S. Naval Station Rota. *See* A.R. 61. The memorandum informed him that the Navy was conducting an audit of its LQAs and that he had been "identified as an employee recruited outside the United States." *Id.* To assist with that audit, the memorandum requested that Carsley provide documentation to verify his eligibility for LQA under DSSR § 031.12(a)–(b). *See* A.R. 61. Carsley provided the documents in his possession, *see* A.R. 214–16, but took no steps to discontinue his receipt of LQA, *see* A.R. 2, 38–39.

3

On January 17, 2019, Carsley received a notice informing him that a "review of [his] records revealed that [he] did not meet the eligibility requirements for Living Quarters Allowance (LQA) under" DSSR § 031.12(a)–(b). A.R. 203. The notice stated that Carsley did not satisfy the requirements of § 031.12(a) because his "actual place of residence to which quarters allowance applied was not fairly attributable to [his] employment by the U.S. Government." *Id.* The Navy determined that his residence "was not fairly attributable" because he "began [his] terminal leave . . . in the local area of Rota, Spain and maintained a residence [there] until . . . immediately prior to appointment." *Id.* Accordingly, because it determined that Carsley had "been erroneously receiving LQA payments," the Navy ordered him to "repay the LQA [he] received," *id.*, which totaled $204,211.18, *see* A.R. 302, 308, 315, 322, 329.

C.     **Procedural History**

On February 18, 2019, Carsley applied for a waiver of his debt pursuant to 5 U.S.C. § 5584(a). *See* A.R. 174. He argued that a waiver was appropriate because he "openly and honestly communicated [his] circumstances to . . . the Rota[] Human Resources Office [] prior to receiving" his LQA. *Id.* The Defense Finance and Accounting Service disagreed. *See* A.R. 169. It reasoned that Carsley's presence in Spain at the time he accepted his civilian position was "contrary to [his] completed questionnaire," A.R. 170, which indicated that he "physically resided" in Philadelphia, A.R. 218. It further stated that this "[m]isrepresentation in documentation . . . statutorily preclude[d] favorable waiver consideration." A.R. 171.

On October 17, 2019, Carsley appealed that decision to defendant Defense Office of Hearings and Appeals. *See* A.R. 137. He wrote that he "had no intention of misrepresenting [his] situation" and that his answers on the questionnaire were attributable to his understanding "'physically lived' . . . to mean legal residence." A.R. 138. He also stated that he first "became

4

aware of the issue of 'residence'" when he received the August 2016 letter from the Rota Human Resources Office. A.R. 139. At that point, he represented, "the difference between 'customarily resident' and other terms associated with residency were explained." *Id.*

On May 18, 2020, the Office rejected Carsley's appeal. *See* A.R. 36. Like the Defense Finance and Accounting Service, it reasoned that Carsley "should have understood" the phrase "physically lived" on his questionnaire and reported that "he was not physically present in the US when he accepted [his civilian] position." A.R. 38. The Office further reasoned that, if Carsley had reported physically living in Spain, "he presumably would have been found ineligible to receive LQA." *Id.* For that reason, the Office concluded that Carsley was "not without fault in the matter, which statutorily precludes waiver." *Id.*

On June 29, 2020, Carsley requested that the Office reconsider its decision, *see* A.R. 7, and provided "documentation that he followed his [Human Resource Office's] advice in completing the hiring paperwork, including the LQA worksheet," A.R. 2. In response, the Office decided to waive some but not all of Carsley's debt. *See* A.R. 3. On one hand, the Office concluded that Carsley "had no reason to question" his receipt of the benefit "until he was notified of the audit of his account on August 16, 2016." A.R. 2. Accordingly, the Office waived the portion of his debt that corresponded to his receipt of the benefit before that date—an amount that totaled $108,243. *Id.* On the other hand, the Office reasoned that the August 2016 notice identified Carsley "as being a locally hired employee," *id.*—that is, an employee who was recruited outside the United States, *see* A.R. 61. It further reasoned that, once he "knew of a potential error" in his receiving LQA, "he should have held the [] payments until he obtained further verification." A.R. 2. Accordingly, the Office declined to waive the portion of his debt incurred after August 16, 2016—an amount that totals $95,968.18. *Id.*

Carsley filed this civil action on January 7, 2021.  *See* Compl., Dkt. 1.  In it, he argues that the Office's decision not to waive his remaining debt was arbitrary and capricious, in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*  *See id.* ¶¶ 1, 56–65.  Carsley filed a motion for summary judgment on July 23, 2021, *see* Dkt. 12, and the Office cross-moved for summary judgment on August 23, 2021, *see* Dkt. 13.  Both motions are now ripe for review.

## II.     LEGAL STANDARD

A court grants summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A "material" fact is one with potential to change the substantive outcome of the litigation.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party.  *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

In an APA case, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006).  The Court will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), or "unsupported by substantial evidence," *id.* § 706(2)(E).

In an arbitrary and capricious challenge, the core question is whether the agency's decision was "the product of reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc.*

6

*v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983).  This Court's review is "fundamentally deferential—especially with respect to matters relating to an agency's areas of technical expertise."  *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (quotation marks and alteration omitted).  The court "is not to substitute its judgment for that of the agency."  *State Farm*, 463 U.S. at 43.  "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Id.* (internal quotation marks omitted).  When reviewing that explanation, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.* (internal quotation marks omitted).  For example, an agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [the explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*  "The party challenging an agency's action as arbitrary and capricious bears the burden of proof."  *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015) (citation and alteration omitted).

**III.    ANALYSIS**

    **A.    The Office's Waiver Decision Is Reviewable**

The APA authorizes judicial review of "final agency action[s] for which there is no other adequate remedy in a court."  5 U.S.C. § 704.  That authorization does not apply, however, "to the extent that . . . [those actions are] committed to agency discretion by law."  *Id.* § 701(a)(2).  In determining whether that exception applies, courts ask whether the authority for an agency action is "drawn in such broad terms" that a reviewing court would have "no law to apply."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1985) (citation omitted).  For that purpose, a court has

"law to apply" where an agency has promulgated regulations that "provide standards for judicial review of [its] actions." *Ctr. for Auto Safety v. Dole*, 846 F.2d 1532, 1534 (D.C. Cir. 1988). A regulation, in turn, provides such standards when it "create[s] binding norms by imposing rights or obligations on the respective parties." *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003).

Here, the Office argues that its waiver decision is unreviewable because Congress left open when collecting a debt "would be against equity and good conscience and not in the best interests of the United States," 5 U.S.C. § 5584(a). *See* Gov't's Mot. for Summ. J. at 10–14, Dkt. 13. But regardless of whether § 5584(a) independently contains law to apply, the Department of Defense has promulgated specific regulations to govern waiver decisions. *See* 32 C.F.R. pt. 284, app. B. Those regulations require the Office to deny waivers in certain circumstances, including when an erroneous payment was "solely or partially the result of the fraud." *Id.* § 2. They also identify several circumstances in which waiver is "usually not appropriate," including where a "recipient knows, or reasonably should know, that a payment is erroneous." *Id.* § 4. In that circumstance, the regulations affirmatively require the recipient "to notify an appropriate official and to set aside the funds for eventual repayment to the Government, even if the Government fails to act after such notification." *Id.* Finally, in all cases, the regulations prohibit the Office from considering the presence or absence of "[f]inancial hardship" in assessing whether a waiver is equitable. *Id.* § 7. Taken together, those regulations impose clear obligations on both the Office and individuals, like Carsley, that seek a waiver of indebtedness. *See Steenholdt*, 314 F.3d at 638. They accordingly create "law to apply," as necessary for judicial review of the Office's waiver decisions. *Ctr. for Auto Safety*, 846 F.2d at 1534.

8

## B. Substantial Evidence Supports the Office's Denial of a Waiver

On the merits, the Office's waiver decision was consistent with the Department of Defense's regulations. As discussed above, the Office declined to waive a substantial portion of Carsley's debt because it found that he became aware of a "potential error in [his] receiving LQA" on August 16, 2016. A.R. 2. That reasoning is consistent with the directive that waiver is "usually" "not appropriate when a recipient knows, or reasonably should know, that a payment is erroneous." 32 C.F.R. pt. 284, app. B. § 4. It is also consistent with the requirement that recipients in such circumstances must "notify an appropriate" government official and "set aside the funds for eventual repayment." *Id.* The Court will thus uphold the Office's decision as long its underlying findings of fact are supported by "substantial evidence," 5 U.S.C. § 706(2)(E).

"Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In this context, sufficient evidence "means— and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co.*, 305 U.S. at 229). Indeed, an agency decision may be "supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Morall v. DEA*, 412 F.3d 165, 176 (D.C. Cir. 2005) (quoting *Robinson v. Nat'l Transp. Safety Bd.*, 28 F.3d 210, 215 (D.C. Cir. 1994)).

There is substantial evidence for the Office's conclusion that Carsley became aware of "potential error" in his LQA questionnaire in August 2016. A.R. 2. When Carsley first applied for that benefit, he reported that he "physically lived" in the United States, A.R. 217, based on

9

his belief that the phrase "physically lived" referred to "legal residence," A.R. 138.  That representation allowed Carsley to qualify for LQA under DSSR § 031.11, which covers individuals who were "recruited . . . in the United States."  In August 2016, however, a memorandum from the Rota Human Resources Office informed Carsley that it understood him to be "recruited from *outside* the United States" and that his eligibility in fact turned on the corresponding "references (a) and (b)" of DSSR § 031.12.  A.R. 61 (emphasis added).  Carsley has acknowledged that this memorandum made him "aware of the issue of 'residence' in determining [his] eligibility" for LQA.  A.R. 139.  He further explained that it helped him understand "the difference between 'customarily resident' and other terms associated with residency."  *Id.*  Based on those remarks, a "reasonable mind" could conclude that the memorandum alerted Carsley to an error in his LQA questionnaire—namely, that it listed his legal residence instead of his physical residence.  *Biestek*, 139 S. Ct. at 1154.

There is also substantial evidence for the conclusion that Carsley became aware of a potential error in his receipt of the benefits themselves.  In this litigation, Carsley argues that his LQA "questionnaire was not the basis" for his receiving that benefit.  Pl.'s Reply Br. at 7, Dkt. 16.  But Carsley acknowledged in the proceedings below that the Rota Human Resources Office "has no records other than the questionnaire" that concern his eligibility.  A.R. 139.  The administrative record likewise lacks any other document that could have supported Carsley's eligibility, and Carsley never proffered a document for consideration, *see* Pl.'s Reply Br. at 7 (stating that "nothing ever told [Carsley] the basis" for his LQA).  Finally, the title of the questionnaire—"Questionnaire for Living Quarters Allowance [] Determinations"—strongly suggests its connection to the receipt of LQA.  A.R. 217.  For those reasons, a reasonable mind could conclude that Carsley, having discovered a potential error in his LQA questionnaire, was

also aware of a potential error in his receiving LQA. *See Biestek*, 139 S. Ct. at 1154. The Office thus had substantial evidence for the decision below, which relied exclusively on that finding. *See* A.R. 2.

In response to the above, Carsley argues that he initially qualified for LQA under the eligibility criteria in DSSR § 031.12(a)–(b), which apply to individuals who were recruited from outside the United States. *See* Pl.'s Reply Br. at 6. If that were true, it would tend to show that the residency error on his questionnaire was harmless. But although one 2019 notice from the Navy states that Carsley qualified under § 031.12(a)–(b), *see* A.R. 203, the government has persuasively argued that the notice is erroneous. Carsley's LQA questionnaire identified him as a resident of the United States, which supported his eligibility under DSSR § 031.11. *See* A.R. 217–18. At the same time, the questionnaire reported that Carsley did not transfer from another overseas position and was not a "local hire." A.R. 218–19. Those second two answers disqualified Carsley from receiving LQA under DSSR § 031.12(a)–(b), which applies to hires who were overseas due to prior government employment. *See* DSSR § 031.12(a). Consistent with that conclusion, Carsley wrote in October 2019 that he was "originally determined to be a U.S. hire." A.R. 139. And the Office treated Carsley as a United States hire in both the decision below and its initial denial of his request for a waiver. *See* A.R. 1–3 (*see supra*); A.R. 38 (noting that "Carsley's erroneous receipt of LQA was only due to his LQA Worksheet inaccurately reflecting that he received the job offer while physically residing in the [United States]"). Carsley's reliance on the record's sole contrary statement accordingly fails.

So too do Carsley's efforts to undermine the decision below by misrepresenting its terms. Carsley argues that the Rota memorandum gave him no reason to doubt his eligibility for LQA because it did not identify him as an "individual erroneously receiving LQA, but merely as an

individual who was subject to a Navy-wide audit." Pl.'s Mot. for Summ. J. at 20, 24, Dkt. 12. But Carsley acknowledged in his administrative proceedings that the memorandum made him "aware of the issue of residence," as relevant to his "eligibility" for an allowance. A.R. 139. And the decision below specifically relied on that "acknowledge[ment]" to establish Carsley's knowledge of a "potential error" in his benefits. A.R. 2–3. Here, because the decision below relied on what Carsley actually drew from the memorandum, this Court need not address the memorandum's text in the abstract.

Carsley's description of the Office's precedents is also unpersuasive. *See* Pl.'s Mot. for Summ. J. at 21–24; *see also ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995) ("[W]here an agency departs from established precedent without a reasoned explanation, its decision will be vacated as arbitrary and capricious."). Here, all Carsley's cases stand for the proposition that a waiver is unwarranted when the applicant for the waiver "knows, or reasonably should know, that a payment is erroneous," 32 C.F.R. pt. 284, app. B. § 4. *See* DOHA Claims Case No. 2016-wv-09131301.2, 2016 DOHA LEXIS 403, at *3–4 (Oct 31, 2016); Case No. 2015-wv-102803.2, 2016 DOHA LEXIS 296, at *3–6 (Jul 25, 2016); Case No. 2013-wv-100216.2, 2014 DOHA LEXIS 111, at *7–8 (June 12, 2014); Case No. 2013-wv-031101.2, 2014 DOHA LEXIS 28, at *3 (Jan. 30, 2014); Case No. 2012-wv-101904.2, 2012 DOHA LEXIS 179, at *3–4 (Dec. 27, 2012); Case No. 2011-wv-072902.2 (March 8, 2012), *reproduced in* A.R. 292–96. The Office relied on that same legal principle in the decision below. *See* A.R. 2. And although Carsley seeks to distinguish those cases on the ground that they contained clearer notice of error, *see* Pl.'s Mot. for Summ. J. at 21–24, whether Carsley had notice of an error in his LQA is a question of fact that this Court reviews for substantial evidence, *see* 5 U.S.C. § 706(2)(E). The APA neither requires nor permits this Court to compare

the strength of factual findings across different agency adjudications.  *See Biestek*, 139 S. Ct. at 1154.

Department of Defense regulations foreclose Carsley's remaining arguments.  First, Carsley faults the Navy for taking multiple years to determine that he was erroneously receiving LQA.  *See* Pl.'s Mot. for Summ. J. at 26.  But the Department's regulations require individuals in his position to "set aside" their possibly erroneous benefits, "even if the Government fails to act [upon] notification" of that error.  32 C.F.R. pt. 284, app. B. § 4.  That final clause prevents the Office from considering whether the Navy's attempt to collect its erroneous payments was timely.  Second, Carsley faults the Office for neglecting the "hardship of returning the overpayment."  Pl.'s Mot. for Summ. J. at 26.  But the Department's regulations specifically prohibit the Office from considering "[f]inancial hardship . . . in determining whether a waiver is appropriate."  32 C.F.R. pt. 284, app. B. § 7.  Finally, Carsley argues that the Office should have addressed the implications of waiver on morale and retention.  *See* Pl.'s Mot. for Summ. J. at 27.  But the decision below properly relied on the Department's instruction that "waiver usually is not appropriate" when the applicant for waiver knew of a possible error in their benefits, 32 C.F.R. pt. 284, app. B. § 4.  And having rested on that instruction, the Office had no obligation to consider incidental effects on morale and retention, especially considering that Carsely failed to raise those considerations below.  *See United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("[O]rderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts.").

## CONCLUSION

For the foregoing reasons, the Office's motion for summary judgment is granted and Carsley's motion to summary judgment is denied. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

March 31, 2022